## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DR. FARSHAD ZAGHI, ZAGHI TRADING PARTNERSHIP, and PAC BAY, INC. | ) ) ) | **05C 7214** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. |
| CIRCLE GROUP HOLDINGS, INC., an Illinois corporation, and DANA L. DABNEY, GREGORY J. HALPERN, EDWARD L. HALPERN, STANFORD J. LEVIN, ALAN G. ORLOWSKY, STEVE H. SALGAN and MICHAEL J. THERIAULT, individuals, | ) ) ) ) ) ) ) | MAGISTRATE JUDGE LEVIN **FILED** DEC 2 7 2005 |
| Defendants. | ) ) | MICHAEL W. DOBBINS CLERK, U.S. DISTRICT COURT |

### COMPLAINT

Plaintiffs Dr. Farshad Zaghi, Zaghi Trading Partnership ("Zaghi Trading"), and Pac Bay,

Inc. d/b/a Bay Financial ("Bay Financial") for their Complaint against Defendants Circle Group

Holdings, Inc., Dana L. Dabney, Gregory J. Halpern, Edward L. Halpern, Stanford J. Levin,

Alan G. Orlowsky, Steve H. Salgan, and Michael J. Theriault allege and state as follows:

### PARTIES

1.     Plaintiff Dr. Farshad Zaghi is a resident of Los Altos, California, and does

business in San Jose, California.

2.     Plaintiff Bay Financial is a California corporation engaged in mortgage and real

estate financing and doing business at 4020 Moorpark Avenue, #117, San Jose, California.  It

provides a pension fund for the sole benefit of its employee, Farhad Zaghi ("Mr. Zaghi") for

whom it makes investments.  The pension fund is administered by Fiserv, Inc, f/k/a First Trust

Corporation.  Mr. Zaghi is solely responsible for choosing the stocks that are bought and sold for

the pension fund account.

3.     Plaintiff Zaghi Trading is a California partnership, doing business at 4020 Moorpark Avenue, #117, San Jose California, and comprised of partners Farhad Zaghi and Farahnaz Ravaee, both residents of California. Zaghi Trading was formed for the purposes of investing and trading in stocks, both through public trading and private offerings.

4.     Defendant Circle Group Holdings, Inc. ("Circle Group") is an Illinois corporation with its principal place of business in Mundelein, Illinois. Circle Group's stock is publicly traded using the legend "CXN." Circle Group has been previously known as Circle Group Entertainment Ltd. and Circle Group Internet, Inc.

5.     Dana L. Dabney ("Dabney") is an individual residing at 121 Old McHenry Rd Hawthorn, Illinois 60047-8976, and is the Chief Financial Officer and Director of Circle Group. As of May 2005, Dabney owned 1,102,000 shares of Circle Group stock and had outstanding options for another 1,155,000 shares.

6.     Gregory J. Halpern ("Halpern") is an individual residing at 1713 North Player Court, Vernon Hills, Illinois 60061-4521, and is the Chairman of the Board and Chief Executive Officer of Circle Group. As of May 2005, Halpern owned 13,408,100 shares of Circle Group stock, with outstanding options to purchase an additional 1,550,000 shares.

7.     Edward L. Halpern is an individual residing at 11008 Morning Dove Lane, Spring Grove, IL 60081-9270, and is a Director of Circle Group. As of May 2005, Edward Halpern, who is Greg Halpern's father, was paid $120,000 by Circle Group. No other Directors are noted as receiving salaries from the company. Edward Halpern also owned 800,000 shares of Circle Group stock as of May 2005, with outstanding options for another 445,000 shares.

8.     Stanford J. Levin is an individual residing at 6466 Forest Avenue, Hammond,

2

Indiana 46234, and is a Director of Circle Group. Although Levin's total stock ownership is not listed in the May 2005 proxy statement filed by Circle Group, he is listed as having options for 145,000 shares.

9.     Alan G. Orlowsky is an individual residing at 630 Dundee Road, Northbrook, Illinois 66062, and is a Director of Circle Group. Orlowsky's total stock ownership also is not listed in the May 2005 proxy statement filed by Circle Group, but he is listed as having options for 170,000 shares.

10.    Steve H. Salgan is an individual residing at 18935 Sharon Court, Lansing, Illinois 60438 and is a Director of Circle Group. Salgan's total stock ownership likewise is not listed in the May 2005 proxy statement filed by Circle Group, but he is listed as having options for 370,000 shares.

11.    Michael J. Theriault is an individual residing at 26151 N. Oak Avenue, Mundelein, Illinois 60060-4055, and is the Chief Operating Officer of Circle Group. His annual salary from Circle Group was $87,500 as of May 2005, and he owned 34,000 shares of Circle Group stock, with additional outstanding options for 965,000 shares.

12.    Dabney, Halpern and Theriault shall be known collectively as the "Officers." Dabney, Halpern, Edward L. Halpern, Levin, Orlowsky and Salgan shall be known collectively as the "Directors." Collectively, as of May 2005, the Officers and Directors owned 35% of Circle Group's outstanding shares, a total of 15,740,065 shares, and held outstanding options for an additional 4.8 million shares.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332. This is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

14.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(a), as a substantial portion of the events giving rise to Plaintiffs' action arose in this District, including that many of the false and misleading communications were made in this District, the Officers and Directors regularly hold board meetings and conduct business in this District, and Circle Group's headquarters is located in this District, as its manufacturing facility.

## ALLEGATIONS COMMON TO ALL COUNTS

**A.     Circle Group is a Fraudulent Sham That Exists Only to Swindle Investors.**

15.     Circle Group has never made a profit and continues to exist solely by raising cash through the sale of its stock through serial stock offerings. Without cash raised by sales of its stock, Circle Group would have long ceased to exist. The company's various business lines have failed or never generated any positive cash flow and, instead, over its existence have generated net accrued operating losses of over $30 million. These losses grow daily as Circle Group's gross revenue from its operating businesses has never exceeded $750,000 and its business lines have generated net operating losses of between $2.8 million and $4.18 million each of the last three years.

16.     Circle Group has included a "Going Concern Qualification" in its 10-KSB and 10-QSB filings with the SEC since December 31, 2004. This qualification underscores Circle Group's dependence on continued investment: "The Company believes it can raise additional funds through private placements of its common stock." That is, the company will continue to exist premised on its ability to fraudulently lure more investors, like the Plaintiffs, into handing their money over to Circle Group.

17.     Circle Group is controlled and directed by Halpern and he is its single largest shareholder, owning 29% of the company's 47,847,348 outstanding shares (down from 42% in

the spring of 2004).[1] Halpern uses Circle Group not only as a vehicle to enrich himself and defraud investors, but as a platform to promote and publicize himself through a tapestry of self-aggrandizing half-truths and exaggerations about his personal history, experience and successes. Circle Group said it best in its filings with the SEC: "Our success depends to a significant degree upon the performance of our founder and chief executive officer, Gregory J. Halpern."

18.     Halpern has hand-picked the Directors and Officers who are friends, cronies and relatives and they have neither sufficient experience nor independence to run or oversee a publicly traded business, or to challenge Halpern's complete control over the business, or to object to and stop his many schemes to defraud the investing public. The Directors and Officers cumulatively own 35% of Circle Group's stock, which, according to the company's SEC filings, means that management "can control the composition of our board of directors and our policies."

19.     Halpern, after seeing Circle Group fail as an entertainment company and then as an internet company, in late 2003, reinvented Circle Group as primarily a food distributor, even though neither Halpern nor the other Directors and Officers have any experience in the food processing or distribution business. To this end, Circle Group is now marketing through one of its subsidiaries, FiberGel Technologies, Inc. ("FiberGel"), a product called Z-Trim, a zero caloric fat substitute product intended to be added to processed foods.

20.     Circle Group's foray into the food business, like its other prior businesses, has to date been a colossal failure generating nothing but losses. But it does not matter to Halpern because he runs Circle Group as a variation of a Ponzi scheme. That is, Halpern directs the issuance of stock options and warrants to himself and the Directors and Officers as part of their

---

[1] Plaintiffs are relying on Circle Group's filings with the U.S. Securities and Exchange Commission for the net loss, data, stock ownership information and other financial information regarding the company. Statements regarding current stock amounts issued and ownership percentages were taken from Circle Groups most recent filing, its 10-QSB for the quarter ended September 30, 2005. Therefore some fluctuations in the amount of stock issued and ownership percentage may have occurred between the filing of that report and the drafting of this Complaint.

compensation and bonuses. For example, in 2004, for serving as Directors, Halpern received 425,000 options, Dabney received 225,000 options, and the remaining Directors each received 125,000 options for Circle Group stock.

21.     Halpern also convinces Circle Group's professionals and consultants to accept warrants, options or stock as payment for services. For example, in 2004 alone, Circle Group issued 3,714,619 shares in exchange for unspecified "professional services."

22.     Halpern then induces investors to invest based on intensive personal communications with large investors or potential investors and through widely disseminated e-mails, public pronouncements and statements that contain false and fraudulent proclamations about Circle Group's successes and allow him to tout, falsely, his views on the future profitability and stock price of Circle Group. These pronouncements and statements cause Circle Group's stock price to rise and attract additional investors, thereby meeting Circle Group's cash needs and allowing its Directors and Officers to profit on their options and stock. Halpern also uses threats, including threats of false accusations of stock manipulations, to keep investors from selling their shares of Circle Group stock even though they have a legal right to do so. Halpern takes such sales as a personal affront, and monitors each large investor in the company to determine if they are making any sales.

23.     When the pronouncements prove to be without basis and Circle Group's stock falls, Halpern then blames others for the fall – bloggers, attorneys, short sellers, even the investors, and uses litigation against anyone who dares to challenge his misconduct or question his veracity. He then starts a new round of pronouncements and statements about some new remarkable development in Circle Group's business that will lead to handsome future profits and an increasing stock price. In this way, he persuades the existing investors not to sell, but to buy

more so when the stock price increases again, the investors will recoup their losses. But more important to Halpern -- the company will live to see another year without actually having created any significant revenue much less a profit, and he and the other Directors and Officers can protect their options and start the cycle anew.

24.     The Directors and Officers at all times knew or had ample reason to know of Halpern's scheme and method of conducting Circle Group's business by means of duping investors, but they have always acquiesced in that conduct and assisted him in furthering the scheme because Halpern purchased their loyalty by compensating them with stock options and warrants that required the Ponzi scheme to continue successfully in order for these insiders to see a profit.

25.     Circle Group's lines of businesses generate only approximately $750,000 annually in gross revenues, and the bulk of Circle Group's gross revenues are attributable to a single subsidiary: On-Line Bedding Corporation ("On-Line Bedding"). On-Line Bedding was founded in 1981 by Edward L. Halpern, Halpern's father, and was acquired by Circle Group (then known as Circle Group Internet, Inc.) in January 1999. The company did not seek or obtain a fairness opinion at the time of the acquisition, despite the fact that it was not an arms-length transaction. Circle Group noted in its SEC filings that the terms were no less favorable for the seller - that is, Halpern's father -- than they would have been in an arms-length transaction, but it tellingly did not state that the terms were equally favorable for the buyer. In fact, at the time of the acquisition questions were raised as to the large amount of compensation that Edward Halpern received for the purchase -- compensation that was, of course, paid in shares of Circle Group stock.

26.     Circle Group divides its operations into three "reportable segments" for SEC

purposes, including "food product development" (including FiberGel and the Z-Trim product), "defense product development" and "e-tailer." The "e-tailer" segment is comprised solely of On-Line Bedding, and in its 2004 10-KSB, Circle Group noted, "The E-tailer division consists of 89% and 87% of our total revenues in 2003 and 2002, respectively." In 2004 Circle Group's total net revenue was only $665,453, and $573,170 of that amount was attributable to On-Line Bedding.

27.      Because Circle Group is not actually selling much of anything, Halpern's and the other Officers' time is free to be spent primarily in attracting new investors and keeping existing investors from selling their stock and inducing them to buy more with promises that they will recover their losses and make huge profits when Circle Group's stock price increases because of exciting, albeit false, new developments in its business.

**B.      Halpern Defrauds Plaintiffs Into Investing in Circle Group.**

28.      In 1999, as a result of individual solicitations made by Halpern on behalf of Circle Group, then known as Circle Group Internet, Inc., Dr. Zaghi purchased $20,000 worth of shares of Circle Group stock through a private placement.

29.      Time passed and Circle Group's internet business failed. So, shortly after Circle Group became a publicly-traded company in December of 2002, Dr. Zaghi sold his shares of Circle Group stock at a loss.

30.      Also in 1999, Mr. Zaghi invested in Circle Group Internet, Inc. As a result of this transaction, Mr. Zaghi was placed on a Circle Group e-mail mailing list, through which he received e-mails from Halpern and Circle Group on an almost daily basis.

31.      Although he had sold his shares of Circle Group stock, Dr. Zaghi also remained on the Circle Group electronic mailing list and also received e-mails from Halpern and Circle Group on an almost daily basis. These e-mails contained updates about Circle Group and its

business activities, including information that supposedly had not yet been announced to the public.

32.     Some of these mailing list e-mails originated from Halpern, who would give positive interpretations and predictions regarding the near certain future increases in Circle Group's stock price, as well as information regarding current and prospective deals and contracts.

33.     At certain times the information contained in the mailing list e-mails caused Circle Group's stock price to increase, as current investors on the list bought additional stock based on the statements made by Circle Group, particularly Halpern, or shared the content of the e-mails with others who then bought Circle Group's stock. The intent of Circle Group, and its Officers and Directors, was to raise desperately needed cash by distributing these e-mails, which contained misrepresentations regarding Circle Group's current and future business and prospects, in the hopes that people would believe the misrepresentations contained therein and would then purchase Circle Group's stock.

34.     As part of this scheme, in late 2003 and early 2004, Circle Group and Halpern were making many public representations regarding the success of Z-Trim. For example, in its 2003 fiscal year end filings, Circle Group stated that "The Company has entered into an agreement with Nestlé for its Z-Trim product." On January 15, 2004, Circle Group issued a press release stating that it had signed an agreement with Nestlé to supply Z-Trim. No disclosure was made that the agreement was short term and terminable at will by Nestlé to allow Nestlé to test Z-Trim in one of its products. No disclosure was made that Circle Group had no ability to obtain the manufacture and delivery of the Z-Trim product that Nestlé had agreed to purchase.

35.     Also in January 2004, Halpern participated in a television interview wherein he

predicted that as a result of Z-Trim and the Nestlé agreement, Circle Group stock would generate net profits equal to $.20 per share for 2004. Considering that there were 40,000,000 shares of Circle Group stock outstanding at the time, this would have meant that Circle Group would generate net profits in the amount of $8 million. These representations were false as Circle Group was not on pace to have $8 million in net profits at that time and Halpern knew that and had no reasonable expectation that Circle Group's profits would reach that level, which, of course, it never did. Instead, the company incurred a net operating loss of $4,185,315 in 2004, a loss of $.11 per share.

36. However, as a result of these statements, and others like them, Circle Group's stock price rose from $2.00 per share to $8.75 per share. Dr. Zaghi and Mr. Zaghi were both informed of Halpern's statements in this interview, and also watched portions of the interview published on Circle Group's website, and believed Halpern's statements to be true.

37. On or about March 15, 2004, Circle Group sent Mr. Zaghi a copy of its business plan, dated February 2004, which Mr. Zaghi then shared with Dr. Zaghi. In this document, Circle Group repeatedly states that "Fiber Gel (a Circle Group subsidiary) has signed a long-term agreement with Nestlé, SA, the largest food company in the world, to supply them with Z-Trim for use in their products"

38. At approximately the same time, Mr. Zaghi also had multiple communications through telephone calls and e-mails from and with Halpern regarding the status and future of the company. In the course of these conversations, Halpern represented to Mr. Zaghi that because: (1) Circle Group had existing contracts for the sale of Z-Trim with major corporations, including Nestlé, and (2) its manufacturing plant was nearing completion in July of 2004 and would allow Circle Group to dramatically and quickly increase its production of Z-Trim, Circle Group's

10

financial success was assured and its stock price would increase dramatically and reward investors who took advantage of the artificially low price of the stock at that time. Mr. Zaghi shared this information with his brother, Dr. Zaghi. However, these representations were false, and Halpern had no reasonable basis to believe in their truth. The Officers and Directors also knew that Halpern was making these statements and that the statements were false, but they did not intervene or rectify the factual misstatements.

39.     Prior to March 16, 2004, Halpern also told Mr. Zaghi that the price of the Circle Group stock would soon reach $10.00 per share and would be trading at $20.00 per share at the end of 2004, at which time the stock would split. Again, Mr. Zaghi shared this information with Dr. Zaghi. Again, Halpern had no belief that these representations were true. In fact, they were false, and known by him and the other Officers and Directors to be false.

40.     On March 11, 2004, George Turner, Vice President of Purchasing for the Nestlé Hand Held Foods Group, spoke to Halpern by telephone to voice Nestlé's concerns about Halpern's public statements concerning the contractual relationship between Nestlé and Circle Group. Mr. Turner reminded Halpern that he had signed a nondisclosure agreement saying that Circle Group would not divulge that it had any kind of relationship with Nestlé. Mr. Turner also sent a follow up letter to Halpern on March 12, 2004 to the same effect, also noting that the contract between Circle Group and Nestlé was only for a year and could be canceled at any time by Nestlé. Of course, these conversations and the actual terms of the test agreement between Circle Group and Nestlé were never disclosed by Circle Group or Halpern to Dr. Zaghi, Mr. Zaghi or the public.

41.     Halpern ignored the terms of the nondisclosure agreement with Nestlé because he needed to hype the news of the deal with Nestlé in order to drive up the Circle Group stock price

and raise desperately needed cash for Circle Group. On information and belief, the Officers and Directors knew that Halpern was violating his nondisclosure agreement with Nestlé, and knew why he was doing so, but took no action to stem Halpern's public announcements regarding the contract.

42. On March 16, 2004, Mr. Zaghi made a commitment to Circle Group for the purchase of Circle Group shares and for warrants, which commitment was honored by the purchase of Circle Group stock by Dr. Zaghi and Mr. Zaghi's uncle, Nuriecl Akhamzadeh.. In addition, the following day, Zaghi Trading bought 13,600 shares of Circle Group stock. Between March 18, 2004 and March 22, 2004, Zaghi Trading bought an additional 15,600 shares of Circle Group.

43. On March 24, 2004, Circle Group circulated the following email from Halpern to its investors including Mr. Zaghi and Dr. Zaghi:

> We are now in the process of building our new plant. This 22,000 sq. ft. plant is located adjacent to our executive offices in Mundelein, Illinois and will be operational by July 2004: We will be able to produce up to 1 million pounds of Z-Trim and 13 million gallons of Z-Bind. (emphasis added).

As a result of this email, Zaghi Trading purchased an additional 9,000 shares of Circle Group stock on March 24, 2004, bringing its total for the month to 38,200 shares. Zaghi Trading paid between $5.20 and $5.59 per share for these shares.

44. This statement was reiterated in Circle Group's March 31, 2004 10-QSB filing with the SEC. Again, this statement was false and neither Halpern, nor any of the Officers and Directors, who knew this false information was being delivered to investors, had any reasonable basis to believe that the plant would be functional by July of 2004, or capable then or at any time of producing the capacity claimed. Nevertheless, the Officers and Directors permitted such statements to be issued and made no attempt to set the record straight.

45.     As a result of the sudden rise in the price of the Circle Group stock and in reliance on the written and oral representations made by Circle Group's Officers, including Halpern, as to the company's business prospects and long-term contract with Nestlé, on March 25, 2004, Dr. Zaghi bought 100,000 shares of Circle Group stock, again as part of a private placement. Before purchasing the shares, Dr. Zaghi was informed by his brother that Circle Group, through Halpern, had promised that his shares would be registered in June of 2004, or, at the latest, July of 2004.

46.     Dr. Zaghi paid $450,000 for the shares, a price of $4.50 per share. At the time of the purchase, the stock price was hovering between $5.10 and $6.20 per share on the open market, despite the fact that tens of thousands of Circle Group shares were being sold on the market almost daily during February and March of 2004. The reason for the stock's buoyancy was that the price was driven up by Halpern's relentless propaganda regarding the Nestlé contract.

47.     As part of its scheme to defraud Dr. Zaghi and other investors, Circle Group and Halpern in misrepresentations both written and oral wove the following story: (a) Circle Group's subsidiary was making a product, Z-Trim, that was already in high demand, that was generating profits and that was going to be highly profitable as time went on; (b) completion of construction of Circle Group's new Z-Trim plant was almost complete and would allow production to increase to meet exploding demand; (c) Circle Group's stock price would leap once the plant opened in July of 2004, because ever increasing large orders from large buyers of the product like Nestlé could be fulfilled; (d) Nestlé was increasing its orders for Z-Trim; and (e) Circle Group's profits would soar once the plant opened and the expanded Nestlé contract was serviced.

48.     Dr. Zaghi and Zaghi Trading relied on these misrepresentations when purchasing the Circle Group stock and would not have purchased the stock had they known the truth -- namely, that Circle Group's plant was nowhere near completion and, in fact, was over budget and late and would not be functional when complete; that Circle Group was experiencing heavy cash flow problems caused by a lack of profitability of any of its business lines, including Z-Trim, which was not generating any profits; and that, at that time Nestlé's relationship with Circle Group was already in jeopardy, because Circle Group had no realistic way of fulfilling the requirements of Nestlé.

49.     After Dr. Zaghi and Zaghi Trading purchased their shares, Circle Group continued its rosy predictions for the future. For example, Circle Group's quarterly filing, issued on May 12, 2004 stated, "FiberGel signed an agreement in January 2004 to supply its Z-Trim zero calorie fat substitute to Nestlé for product development." On May 13, 2004, Circle Group announced an increase in Nestlé's order of the Z-Trim product to 215,000 pounds, valued at $881,000 over the time period from May 2004 to December 2004.

50.     Again, on May 21, 2004, Circle Group circulated an email to Mr. Zaghi and Dr. Zaghi, among others, saying:

> Things are very busy here. We are making Z-Trim as fast as we can trying to keep up with the ever increasing orders and requests. This is an exciting time as we move Z-Trim from a product concept to the manufacturing phase.
> Our plant is moving ahead as scheduled. It should be quite far along by the time we have our shareholders meeting on June 16. . .
> We had an increase in our order from Nestlé.

This statement was false as Circle Group had no "ever increasing orders and requests" and knew that the plant would never be functional by July. The Directors and Officers also knew that Circle Group was not meeting its contractual obligations to Nestlé, and that the plant was behind schedule.

14

51.     Nevertheless, the Plaintiffs reasonably relied on this statement. Beginning on May 28, 2004 and continuing through June 25, 2004, Zaghi Trading Company purchased 155,900 more shares of Circle Group shares, for a total of 191,900 Circle Group shares in its portfolio. The price for the shares hovered between $4.90 and $5.74 per share during this period.

52.     The May 21, 2004 statement and the others like it, were in direct and continued violation of Circle Group's nondisclosure agreement with Nestlé. As a result, on May 26, 2004, Mr. Turner, Vice President at Nestlé, wrote another letter to Halpern asking him to cease and desist his extensive public statements about the agreement between Circle Group and Nestlé, especially those statements involving specific volumes of Z-Trim and dollar amounts. On information and belief, Halpern continued to ignore Mr. Turner's requests because he wanted to keep Circle Group's stock price high, and wanted investors, like the Plaintiffs, to continue to buy Circle Group stock at its inflated price.

53.     In the month of May 2004, Circle Group breached its agreement with Nestlé by shipping only 3,100 pounds of Z-Trim to Nestlé even though it was contractually obligated to send 7,500 pounds. As a result, on June 7, 2004, Mr. Turner, Vice President at Nestlé, sent yet another letter to Halpern, noting the shortfall and asking for reassurances that Circle Group could meet its obligations under the contract, including the 12,000 pounds of Z-Trim that Circle Group was to produce to Nestlé in June 2004.

54.     In June 2004, Circle Group delivered less than 3,500 pounds of Z-Trim to Nestlé. At that time contractual shortfall between the requirements of the contract and what Circle Group actually delivered was over 12,000 pounds in just two months.

55.     On June 21, 2004, Halpern sent an email full of excuses to George Turner, at Nestlé, which said:

15

> At this time we can allocate a minimum monthly Z-Trim production capacity for Lean Pockets of 18,000 pounds until September when we can increase to 26,000 pounds. . . This confirms my discussion with you that the Quality Ingredient plant was a big flop. . . If the Humko plant is successful next week, this will add between 5000-6000 pounds monthly commencing pro rata by the end of next week... I can spare another 1200 pounds from Van Drunen the first week of July but their plant is way too inconsistent to make any other predictions to add to the mix . . In October, you will have an available allocation of 36,000 to 37,000 lbs per month from our Mundelein plant... (emphasis supplied).

56.     Circle Group had not only breached its agreement with Nestlé by the shortfalls in May and June, but was obligated to provide Nestlé with 22,500 pounds of Z-trim in July 2004 and 42,500 pounds per month from August through December 2004, which Halpern admitted Circle Group could not possibly deliver. Based on the amounts listed in Halpern's e-mail to Mr. Turner, Circle Group could only guarantee 18,000 pounds in July and August (with the possibility of an additional 5,000-6,000 pounds "[i]f the Humko plant is successful," and possibly another 1,200 pounds from the "inconsistent" Van Drunen plant). By September 2004, Circle Group could only promise 26,000 pounds -- 16,500 pounds less than it was contractually obligated to provide.

57.     Further, Halpern had reassured Circle Group investors, including Dr. Zaghi and Mr. Zaghi, in his March 24, 2004 e-mail that by July the Mundelein Z-Trim plant "will be able to produce up to 1 million pounds of Z-Trim [annually]." This amounts to 83,333 pounds per month. Two months later he assured the investors, including Dr. Zaghi that the Z-Trim plant "[was] moving ahead as scheduled." But a month later, on June 21, 2004, Halpern was telling Nestlé that the once the Z-Trim plant was operational in October, it would be producing only 36,000 - 37,000 pounds of Z-Trim per month -- a shortfall of approximately 46,333 pounds per month, or 556,000 pounds per year, more than a 50 % reduction in the capacity Halpern had promised to Nestlé and to the investors.

58.     Meanwhile, as June 2004 passed, Dr. Zaghi's 100,000 shares were still not registered, and Circle Group's stock price was falling. When he learned that Dr. Zaghi's shares had not been registered for sale as had been represented by Circle Group, Mr. Zaghi repeatedly telephoned Halpern in June of 2004 to complain. Halpern deflected these inquiries by changing the subject to the share price and its fluctuations based on what he characterized as short-selling.

59.     However, on information and belief, Circle Group delayed that registration of Dr. Zaghi's shares because it did not want to upset the stock price before it could issue yet another stock offering to raise more money for the increasingly expensive Z-Trim plant. Circle Group needed ready cash as it knew that its contract with Nestle was in jeopardy, and because it knew that the stock price would fall if the Nestle contract was canceled and that cancellation became public, it needed to raise that money soon. Therefore, in preparation for another stock offering, on June 26, 2004, Circle Group registered an additional 2.2 million shares of its stock. The 100,000 shares of Circle Group stock purchased by Dr. Zaghi in March of 2004 were not included in this July 2004 registration although he had been told that his shares were to be registered by no later than July of 2004. As a result of the registration, and the implied imminent dilution of shares, the stock price dropped. Because his shares were not among those registered in July 2004, Dr. Zaghi was left with stock he could not trade while the share price of Circle Group's stock fell after the June 26, 2004 stock registration.

60.     On July 1, 2004, in response to investor concerns about the stock price, Halpern wrote to Circle Group's shareholders including Mr. Zaghi and Dr. Zaghi:

> We have had some calls and emails regarding the stock price. Aside from the market being generally poor right now for small caps, we have been experiencing an accumulation of [short sales] again... which is part of the ebb and flow of the market.
> We are very close to completing our plant. Those who were at the shareholders meeting a couple of weeks ago saw this work in progress.

17

The plant will give us the ability to deliver existing orders and ramp up sales this summer, which is of course one of the keys to successfully building our business as well as enhancing the value of our stock.
Until a year ago nobody had been able to figure out how to even make our unique product. Now we are just a short time away from mass production of not only Z-Trim, but also our exciting byproduct Z-Bind. All of us here are very excited about the prospects of the company.

These statements were false and known by Halpern to be false. He knew that the plant was not close to completion, that the relationship with Nestlé was in jeopardy, that Circle Group was not in a position to deliver its existing orders, and that Circle Group was in no position to mass produce anything except more issuances of its stock. Further, the Officers and Directors knew that the statements made by Halpern were deliberately false and misleading, and they participated in such statements by omission, in that none of them set the record straight.

61.     However, in reliance on Halpern's statements, Zaghi Trading bought 33,100 more shares of Circle Group stock on June 30, 2004 and July 1, 2004. Zaghi Trading paid between $4.88 and $5.20 per share for these purchases.

62.     On July 7, 2004, Nestlé Vice President George Turner sent a certified letter to Halpern, terminating Nestlé's contract with Circle Group. Halpern refused service of the letter, but he knew of its contents, which were also sent to him by telecopy.

63.     Mr. Turner's letter outlined Circle Group's shortfalls in its supply of Z-Trim and how it affected Nestlé's manufacture and development of its new product, which was to launch on June 1, 2004. Mr. Turner further noted that the future delays described in Halpern's June 21, 2004 email were unacceptable to Nestlé, and that the Z-Trim product that was delivered was often out of specification to the contract. Mr. Turner therefore declared Circle Group in breach of its contract and terminated the agreement effective immediately. Circle Group never challenged this termination or the grounds for it.

64.     On or about July 7, 2004, on information and belief, the Circle Group Officers

and Directors knew that Nestlé no longer intended to purchase any amount of Z-Trim. The Officers and Directors knew that the cancellation of this contract was a material fact, the omission of which would affect the decision of the average investor as to whether to buy or sell shares of Circle Group stock. The Officers and Directors of Circle Group nevertheless made the decision, or acquiesced in Halpern's decision, not to disclose the cancellation of the Nestlé contract to the public or to Circle Group's shareholders.

65.     Despite knowing that the Nestlé relationship was in jeopardy and then knowing that the Nestlé contract was terminated, Halpern, Dabney and Theriault sold stock in Circle Group before Circle Group was forced to announce on October 15, 2004 that Nestlé had ended its relationship with Circle Group. Between May 26, 2004 and September 28, 2004, Dabney sold 64,000 shares of his Circle Group stock. Theirault sold 50,000 of his shares on August 2, 2004. Halpern between June 5, 2004 and October 7, 2004 sold 84,000 shares of his Circle Group stock.

66.     Although the news of the termination of the Nestle contract was not made public by Circle Group or its Officers and Directors, between July 7, and July 9, 2004 the share price of Circle Group's stock fell from $4.93 to $2.80, more than a 42% decrease. The stock had not fallen below $4.60 since January 20, 2004. Also, on July 9, 2004 alone, the volume of trade of Circle Group's stock quadrupled its average from the previous weeks. On information and belief, insiders at Circle Group shared the news about the termination of the Nestle contract with select investors, who sold their shares and thus caused the flurry of trading activity and drop in price.

67.     Even if they were not directly informed by Halpern that Nestle had canceled its contract, the Officer and Directors should have known that a significant event had occurred at the

19

company based solely on the volatility of the stock in the market. Circle Group, its Officers and Directors, did not, however share the news with all of the investors or the public. Mr. Zaghi and Dr. Zaghi had no idea that the contract was canceled, despite multiple calls made by Mr. Zaghi to Halpern at this time. During those calls Halpern gave Mr. Zaghi the same story - the stock price was falling because of false rumors circulated on the internet by short-sellers.

68. As the stock price was falling, Zaghi Trading faced a dilemma. It had bought its Circle Group shares on margin, and as the share price fell below $5.00, it either had to sell its shares or find the money to pay for them. Further, because he still believed the lies being spun by Halpern, Mr. Zaghi did not want to sell Zaghi Trading's shares on the open market. Instead he sold the shares to his pension fund at Bay Financial, where an immediate return was not as crucial. Since his intention was to keep the shares until the price rose again, as Halpern promised it inevitably would, due to the Nestle contract, Mr. Zaghi determined that his pension fund was a better repository for the shares. To that end, Zaghi Trading transferred the majority of its Circle Group shares to Bay Financial during the month of July 2004. This divestiture was done at a substantial loss, as the price paid by Bay Financial for the shares hovered between $2.28 and $4.23 per share during that period.

69. On Sunday, July 11, 2004, Halpern circulated an email to some of the large shareholders in the company asking that they participate in an emergency conference call with him that day to discuss the decline in the stock price and the registration of the 2.2 million shares. During that call, in which Mr. Zaghi participated at Halpern's invitation, Halpern reiterated that Circle Group's falling stock price was the result of short sellers smearing the company on the internet in the hopes that they would make a profit when the stock fell.

70. During the same conference call, Halpern also falsely stated that the stock

registration was not the result of cash flow problems, when in fact it was, and that Circle Group did not intend to sell the 2.2 million registered shares when, of course, it did. On information and belief, Circle Group needed to raise money through the sale of additional shares because it was desperately trying to finish the Z-Trim plant on time and was paying over-time and other additional costs to do so. On information and belief, investors were told that the cost of the Z-Trim plant would be approximately $1 million but the final cost was more in the range of $3 to $4 million.

71.     Halpern also stated that once the Z-Trim plant was complete, profits would begin increasing with increased sales to Nestlé and other imminent prospects. Halpern did not at any time during this conference call inform the shareholders that the Nestle contract was canceled or that the company was facing financial difficulties.

72.     Finally, as part of that July 11, 2004 conference call, Halpern asked the investors to support the company by buying more stock and to take their stock certificates from the brokerage houses so the short eventually would become a "squeeze," and the supposed short-sellers would be foiled and the stock price would stabilize.

73.     The next day, Monday, July 12, 2004, Halpern issued a public statement about the stock registration:

> "We believe that the recent weakness in our stock may be related to the issuance of the shelf registration statement," said Greg Halpern, Circle Group' s CEO. "I want to assure sharcholders that we currently have no need to raise capital to support our growth. The registration was put in place so that we may selectively take advantage of opportunities in the future, including acquisitions, when market conditions might warrant."

The statement further noted, "The Company has already funded the equipment and improvements to the plant that produces Z-Trim." Of course, these statements were untrue when made and Halpern knew they were untrue when he made them. Further, the Officers and Directors knew that the

21

statements were untrue but they did not issue a correction. The registration was issued precisely because Circle Group needed cash, and it needed the cash to fund the over-time and other unexpected costs of the Z-Trim plant, and it had no other way to raise it other than through the sale of yet more stock. However, the telephone conference and the public announcement by Halpern were intended to reassure the investors and to cause a bump in the stock price, and they did so. The stock began trading at $2.94 on July 12, 2004 and closed at $3.73.

74.     Between June 2004 and August 2004, Dr. Zaghi bought approximately 150,000 additional shares of Circle Group stock on the open market in reliance on the misrepresentations made by Circle Group and its Officers and Directors regarding Circle Group's financial status and prospects and its contract with Nestlé.     From March to July 2004, Zaghi Trading had purchased some 223,500 shares of Circle Group stock based on the same misrepresentations. Further, as a result of the drastic reduction in Circle Group's stock price, Mr. Zaghi transferred all of the shares of Circle Group stock owned by Zaghi Trading to his Bay Financial pension account in July and early August of 2004. He decided to hold those shares in his pension fund for the long term until the price improved, rather than sell them on the open market, premised on his reliance on Halpern's misrepresentations.

75.     On August 6, 2004, Circle Group finally filed a registration statement for 17,583,329 shares of common stock, including the stock purchased by Dr. Zaghi. No mention of Nestlé was made in the registration statement. This registration was also much larger than Dr. Zaghi was originally led to believe it would be. When he first paid for the shares, the registration was to be for 2.2 million shares, including warrants. Further, although this registration of shares gave Dr. Zaghi the ability to sell his shares, there were still some restrictions as to the timing of such sales. Thus, Dr. Zaghi began an immediate process of trading his restricted shares for

unrestricted shares.

76.     On August 16, 2004, Circle Group filed its 10Q quarterly report for the second quarter of 2004. Nestlé was not mentioned anywhere in the filing.

77.     Throughout 2004, Mr. Zaghi was urged by Mr. Halpern to purchase shares of Circle Group stock from other investors who wanted to divest and who otherwise would have sold their stock on the open market. Halpern pressured Zaghi to buy these shares by arguing that large sales of the company's stock on the open market would hurt Zaghi Trading's and Bay Financial's investments as well as those of Mr. Zaghi's brother and uncle. On multiple occasions, Mr. Zaghi acceded to these requests and bought large blocks of additional stock either through Zaghi Trading or his pension account at Bay Financial.

78.     However, in August 2004, Halpern made a new demand. He contacted Mr. Zaghi and indicated that despite its public announcement to the contrary on July 12, 2004, Circle Group desperately needed cash. Halpern thus asked Mr. Zaghi to purchase more shares to protect the share price and the investment made by Zaghi Trading, Bay Financial and Mr. Zaghi's relatives, Dr. Zaghi and Mr. Akhamzadeh. Circle Group's cash flow problems worsened at this time as rumors in the market swirled that Circle Group's relationship with Nestlé was in jeopardy and the new plant was turning into an over priced white elephant. Halpern also threatened Mr. Zaghi that if he did not purchase some portion of the shares registered in July, Circle Group would sell the shares in the open market and further depress the value of the stock.

79.     On August 25, 2004, Circle Group stage-produced an official ribbon-cutting ceremony for the new Z-Trim plant in Mundelein, Illinois. As the communications to and from Nestlé show, the plant was in no way completed or running at the capacity touted by Halpern in his e-mails to the investors. On information and belief the official opening of the plant was

staged to provide the basis for the issuance of a press release and some positive spin on the company in the media, to supplant the growing rumors that things were not going so well between Circle Group and Nestlé. The ruse worked and the stock price received a temporary bump from $1.75 to $2.85 during the ten days before the grand opening.

80.     But Circle Group could not avoid the inevitable. Only a day later, on August 26, 2004, a website publicly reported what the Directors and Officers of Circle Group had known for over two months -- that Nestlé was no longer using Z-Trim in the manufacture of its products.

81.     Mr. Zaghi immediately contacted Halpern to inquire. Halpern responded that this was merely an unfounded attack on Circle Group, that he would be suing the website owner and that he would bring them down. Halpern told Mr. Zaghi he could not share with him any information about Nestlé because it was not public, but that he did not need to worry. Mr. Zaghi shared Halpern's reassurances with Dr. Zaghi.

82.     On October 6, 2004, the Dow Jones News Service published a story with the lead "Swiss food giant Nestlé SA (NESN.VX) has stopped using Circle Group Holdings, Inc.'s (CXN) zero-calorie fat substitute called Z-Trim." The article was based on an e-mail sent to Dow Jones Newswires by Loretta Ivany, the communications and media manager for Nestlé USA. The article also noted that while a Circle Group press release in May of 2004 had said Nestlé would pay $881,000 for 215,000 pounds of Z-Trim, "[i]t's unclear whether the whole contract was fulfilled..." In fact, only a minimal portion of the contract was filled. As of the time of the article, Circle Group's stock was trading at $1.40 per share.

83.     Finally, with its stock price declining and its plant not fully complete (despite the "ribbon-cutting ceremony,"), on October 8, 2004 -- three months after Nestlé had canceled its contract -- Circle Group issued a press release entitled "Company Targeted in Coordinated

24

Business Assassination Campaign." In this press release, Halpern blamed the internet, bloggers and chat room posters for interfering with Circle Group's business relationships, including its relationship with Nestlé, asserting that Nestlé was getting daily harassing calls about Circle Group and implying that those calls were the reason the Nestlé relationship was in jeopardy when in fact it had been terminated three months before as a direct result of Circle Groups' abysmal failure to perform.

84.     Buried in the third paragraph was an acknowledgment that Circle Group's "production capacity was not satisfactory to meet the increased demand," and Circle Group was "not currently shipping product to [Nestlé] at this time." To end on an up note Halpern stated that Circle Group was "optimistic" about its future relationship with Nestlé. At the time he made these statements, Halpern knew they were false and misleading. Not only was Circle Group not shipping Z-Trim to Nestle at the time, it had no prospect of shipping to Nestle in the future -- the agreement had been terminated.

85.     Throughout this time, Mr. Zaghi continued to be pressed by Halpern to purchase additional stock from the 2.2 newly-registered shares in order to help the company with its cost over-runs related to the Z-Trim plant and other marketing costs supposedly related to the launch of Z-Trim on the market. Rather than purchasing the shares himself, Mr. Zaghi's uncle Nurieel Akhamzadeh decided to purchase the shares to Halpern's great relief and appreciation. However, Halpern told Mr. Zaghi that because Mr. Akhamzadeh already had an outstanding Full Recourse Promissory Note with Circle Group signed in May 2004 for the purchase of 453,333 shares of the company, it would be better if Mr. Akhamzadeh did not purchase the shares directly. Instead, the shares would be sold to Mr. Zaghi on Mr. Akhamzadeh's behalf and Mr. Zaghi would then transfer the shares to Mr. Akhamzadeh. Thus, Mr. Akhamzadeh, at Halpern's

direction and agreement, had Mr. Zaghi purchase the 1,000,000 shares on his behalf and the shares were then immediately transferred to Mr. Akhamzadeh's name. Halpern not only knew of and approved this transaction he assisted in expediting the transfer of the shares from Mr. Zaghi to Mr. Akhamzadeh.

86.     Mr. Akamzadeh's purchase, through Mr. Zaghi, was made in part based on Halpern's assurances that once the plant was completed Circle Group's stock price would once again rise, and partly in reaction to Halpern's threats that a sale of the shares on the open market would further depress the stock price, rendering the shares purchased by Dr. Zaghi, Zaghi Trading and Bay Financial worthless. On October 13, 2004, Zaghi Trading, relying on these same reassurances and threats made by Halpern to Mr. Zaghi, purchased 152,222 shares of Circle Group stock at prices between $1.34 and $1.40 per share. When these purchases were made, Circle Group was still withholding information regarding the cancellation of the Nestle contract.

87.     Only days later, on October 15, 2004, Circle Group finally announced that Nestlé was no longer using Z-Trim, and that Circle Group had "no expectation of delivering Z-Trim to Nestlé... through year-end." Nervous about the future of the company, Mr. Zaghi directed Zaghi Trading to sell all of its shares in Circle Group as of October 20, 2004. The majority of the stock, 112,122 shares, was transferred to the pension fund at Bay Financial for $1.30 per share.

88.     However, when Mr. Zaghi, shocked by the news about the Nestle contract, called Halpern to complain, Halpern told Mr. Zaghi that he was pressured by the American Stock Exchange to release the news about Nestlé because of the many inquiries the exchange was receiving. Halpern further told Mr. Zaghi that Circle Group did not need Nestlé because Circle Group's wholesale business was small and unprofitable compared to the several large retail

commitments Circle Group was receiving, including: (1) contracts with Albertson's stores to stock Z-Trim salad dressing; (2) contracts with Senticor and Pacific Lumber for another Circle Group product called Z-Bind; (3) potential contracts with Smith, General Dynamics and Philips for yet another Circle Group product, ThraxVac, (4) discussions with Oral B regarding a fourth project and (5) contracts with McDonald's, Pizza Hut and a meat factory for Z-Trim. Halpern told Mr. Zaghi that Circle Group would be announcing at least 8 major contracts with purchasers of its products in December 2004. Later Halpern told Mr. Zaghi those announcements would be made in January 2005, because he thought that the announcements would get lost in the shuffle of year-end and the holidays. The announcements, of course, were never made because the contracts did not exist.

89.     Halpern kept making these representations to Mr. Zaghi throughout the end of 2004 and in early 2005 in lengthy late night telephone conversations, which Mr. Zaghi in turn relayed to Dr. Zaghi, that Circle Group was just weeks away from announcing a multimillion dollar deal, even though Halpern had no basis to believe any of these representations were true.

90.     Based on these representations and assurances, Zaghi Trading re-invested in Circle Group, purchasing 257,000 shares in November 2004. Although Zaghi Trading sold some of those shares in the months of November and December 2004, as of the end of December 2004, Zaghi Trading still owned 208,503 shares of Circle Group. Although it sold some shares from time to time during the period of August to October 2004, Bay Financial also continued to buy Circle Group stock for Mr. Zaghi's pension, both from Zaghi Trading and on the open market. As of December 2004, Bay Financial owned 676,000 shares of the company. Dr. Zaghi likewise continued to buy additional shares of Circle Group stock, until April of 2005 when no further deals to replace Nestlé were forthcoming, contrary to Halpern's representations to Mr.

Zaghi.

91.     After its announcement about the end of the Nestlé contract, Circle Group suddenly became preoccupied with creating a paper trail for its stock transactions and complying belatedly and fraudulently with federal and state securities regulations. Circle Group had not issued subscription agreements to Dr. Zaghi, and began frantically calling and faxing Dr. Zaghi and Mr. Zaghi in order to get Dr. Zaghi to sign a back-dated subscription agreement.

92.     On November 2, 2004, Dabney faxed to Mr. Zaghi a form subscription agreement for Dr. Zaghi's signature. On the cover page Dabney noted, "Please use dates provided for both." (emphasis in the original). The date on Dr. Zaghi's subscription agreement was March 20, 2004. On information and belief, Circle Group was trying to cover up its illegal and fraudulent activities by using this backdated subscription agreement.

93.     In 2005, realizing that they had been duped by of Circle Group's misrepresentations and schemes, the Plaintiffs began selling their Circle Group shares in order to remove themselves from an increasingly unstable company. These sales were made at a significant loss due to Circle Group's misrepresentations and concealment of material facts concerning its relationship with Nestlé and other supposed purchases of Circle Group's products. All told, when Dr. Zaghi finally managed to sell all of his Circle Group shares, including those purchased in the private placement on March 25, 2004, he realized a loss of approximately $400,000. Zaghi Trading's loss was $687,380.40. Bay Financial, however, suffered the most, with a total loss of $809,211.12.

## COUNT I

### FRAUD (CIRCLE GROUP)

94.     Plaintiffs incorporate by reference paragraphs 1-90 of this Complaint.

95.     As alleged herein the misrepresentations and omissions of material facts by Circle Group were designed and intended by Circle Group to induce the Plaintiffs to purchase shares of Circle Group stock beginning in March of 2004 and continuing until April of 2005, thereby allowing Circle Group to attempt to prop up its stock price and receive a stream of cash.

96.     Circle Group knew or should have known that its representations concerning its current and future profitability, the strength of its relationship with Nestlé and ability to service Nestlé's business, the timely completion of its plant, the imminent multimillion dollar deals with other businesses and the prospects for future growth were false and inaccurate. Instead, Circle Group failed to disclose that Circle Group's relationship with Nestlé was tenuous and about to break up, that its proposed plant was mired in delays, overruns and other problems, and that its business was so unprofitable that, but for infusions of investor money, Circle Group had no present ability to survive.

97.     Plaintiffs relied upon these representations by Circle Group and were thereby induced to invest in Circle Group. Further, Plaintiffs were directly and proximately injured when, shortly after their investment, Circle Group's inflated stock price plummeted as the market discovered Circle Group no longer had a relationship with Nestlé.

98.     The fraud perpetrated by Circle Group was intentional, malicious and designed and intended to injure the Plaintiffs and other investors solely to allow Circle Group to continue its Ponzi scheme: by duping an ever widening pool of investors and selling more and more stock, it generated enough cash to remain in business for the benefit of the Directors and Officers when its actual business had never been profitable and likely would never be.

99.     The Plaintiffs have been directly and proximately injured by Circle Group's fraud to their detriment in that they have lost approximately $2,000,000 as a result of their investment

29

in Circle Group, and have incurred costs and attorneys' fees in prosecuting their claims. To deter and punish Circle Group from its intentional misconduct, Plaintiffs are entitled to an award of punitive damages in an amount in excess of $5 million.

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendant Circle Group Holdings, Inc., awarding them damages in the amount of $2,000,000, reasonable attorneys' fees and costs, punitive damages in an amount in excess of $5 million, and such other and further relief as the Court deems just and proper.

## COUNT II

### STATUTORY FRAUD (CIRCLE GROUP)

100. Plaintiffs incorporate by reference paragraphs 1-90 of this Complaint.

101. Circle Group's misconduct alleged herein was a violation of the California statutory fraud provision, California Civil Code Section 1709, which provides that:

> "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

102. Circle Group's misconduct alleged herein also operated as a deceit as provided in California Civil Code Section 1710 which defines a deceit within the meaning of Section 1709 as:

1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

4. A promise, made without any intention of performing it.

103. Circle Group's misconduct alleged herein was deceitful within the meaning of

each of the four grounds set forth in Section 1709.

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendant Circle Group Holdings, Inc., awarding them damages in the amount of $2,000,000 and reasonable attorneys' fees and costs, punitive damages in an amount in excess of $5 million, and such other and further relief as the Court deems just and proper.

**COUNT III**

**FRAUD (OFFICERS AND DIRECTORS)**

104.    Plaintiffs incorporate by reference paragraphs 1-90 of this Complaint.

105.    From approximately May 2004 until October 2004, the Officers and Directors of Circle Group knew or should have known that Circle Group's contract with Nestlé was in jeopardy due to Circle Group's complete inability to meet its contractual commitments for the supply of Z-Trim.

106.    The Officers and Directors of Circle Group knew, or should have known that shipments to Nestlé were insufficient by 12,000 pounds for May and June of 2004.

107.    The Officers and Directors knew or should have known that Nestlé had written Circle Group letters threatening to terminate the contract if the correct amounts of Z-Trim could not be supplied.

108.    The Officers and Directors also knew during the same time period that the Z-Trim plant would not be fully operational within the time frame that had been announced to the public, and that once the Z-Trim plant was operational it would be producing amounts much smaller than originally announced. The Officers and Directors therefore knew that Circle Group would not be able to meet its contractual commitments to Nestlé going forward.

109.    The Officers and Directors knew that Circle Group's stock price had increased

31

threefold in the early months of 2004 (January through March) based largely on Circle Group's misleading public announcements of its contract with Nestlé for the supply of Z-Trim and Halpern's misleading representations to potential investors, and they knew that the price of Circle Group's stock was artificially inflated.

110.    The Officers and Directors also knew, or should have known, as of July 7, 2004 that Nestlé has terminated its contract with Circle Group and elected not to disclose this material fact, but to keep it concealed.

111.    The Officers and Directors made the deliberate decision to provide false information to the public and to Circle Group's shareholders, including the Plaintiffs.

112.    As alleged herein the misrepresentations made by Halpern, all known to the other Officers and Directors, and the omissions of material facts by Circle Group and Halpern and acquiesced in by the Officers and Directors were designed and intended by the Officers and Directors to induce the Plaintiffs and other investors to purchase shares of Circle Group stock, thereby allowing Circle Group to attempt to prop up its stock price and receive a stream of cash, to benefit themselves at the expense of the investing public.

113.    The Plaintiffs did rely upon these representations and omissions of material fact by the Officers and Directors and was thereby induced to invest heavily in Circle Group. Further, the Plaintiffs were directly and proximately injured when, after their investment, Circle Group's inflated stock price plummeted as the market discovered Circle Group no longer had a relationship with Nestlé, or with any other purchaser of its Z-Trim product.

114.    The Plaintiffs have been directly and proximately injured by the Officers' and Directors' fraud to their detriment in that they have lost approximately $2,000,000 as a result of their investment in Circle Group, and have incurred costs and attorneys' fees in prosecuting their

claims.

WHEREFORE, Plaintiffs pray for judgment in their favor and jointly and severally against Defendants Dana L. Dabney, Gregory J. Halpern, Edward L. Halpern, Stanford J. Levin, Alan G. Orlowsky, Steve H. Salgan, and Michael J. Theriault, awarding them damages in the amount of $2,000,000, and reasonable attorneys' fees and costs, punitive damages in an amount in excess of $5 million, and such other and further relief as the Court deems just and proper in the circumstances.

FARSHAD ZAGHI, ZAGHI TRADING
PARTNERSHIP, and PAC BAY, INC.

By: _____
    One of Their Attorneys

William M. McErlean, ARDC #3122871
Pascale J. Bishop, ARDC #6273759
BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
(312) 357-1313

CHDS01 PBISHOP 305872v6